IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BURKE, MELISSA BURKE, CLIFTON FARINA,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; et al.,<br><br>Defendants. | No. C 06-04533 SBA<br><br>**ORDER**<br>[Docket Nos. 80, 86, 98] |

Currently before the Court are the parties' dueling motions for summary judgment [Docket Nos. 80 & 86]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby grants in part the defendants' motion, and denies the plaintiffs' motion, for the reasons set forth below.

## **BACKGROUND**

This case involves the warrantless removal of a minor, B.F., from her family by defendant Detective Mark Foster on July 12th, 2005, and the subsequent arrest of B.F.'s stepfather, David Burke one month later on August 12th, 2005 by Deputy Tony Bartholomew. The claims involved in this action are: 1) the liability of Detective Foster for removal of B.F. without a warrant; 2) the liability of the County of Alameda for allegedly maintaining a policy, practice or procedure resulting from inadequate training whereby Alameda sheriff deputies do not ever procure protective custody warrants and are trained that a protective custody warrant is never required to remove a child; and 3) the liability of defendant Bartholomew for the use of excessive force in the arrest of David Burke by pointing his gun at an unarmed Mr. Burke during the arrest.

## I. The Warantless Removal

### A. The Runaway and Subsequent Interview

Plaintiffs Melissa Burke and Clifton Farina are the natural parents of B.F., and though divorced share joint legal custody of B.F. Plaintiff David Burke is B.F.'s step-father, who has lived with her since she was an infant. B.F. was 14 years of age at the time she was removed from her parents.

B.F. ran away from home in the evening of June 21st, 2005. She left a note saying she was going to Los Angeles with a woman she had met, but instead had in fact left with Ricardo Maciel, a 19 year-old male. It was later determined that B.F., then 14 years old, had consensual sexual relations with Maciel while she was away from home. *See* CALICO interview tr. at 6:7-15. Mr. and Mrs. Burke immediately reported the disappearance to the Alameda County Sheriff's Office, and the Alameda County Sheriff's Office initiated an investigation. Def.'s Mot. at 2. After a few days, the Burkes became dissatisfied with the Alameda County Sheriff's Office's investigation, and eventually contacted the Internal Affairs Department of the Alameda County Sheriff's Office to complain about the allegedly slow pace of the investigation. *Id.*

On June 30th, 2005, Mr. Burke contacted an unrecognized phone number on the Burke's phone bill from the evening B.F. ran away, and told the young man who answered the phone that his daughter was 14 years old and if they found her with him he was going to jail. B.F. returned home a few hours later. When B.F. arrived, Mr. Burke struck her several times when she refused to disclose information about Maciel after admitting having sexual intercourse with him. *Id.* at 3.

Two days after B.F.'s return home, Mr. Burke contacted Detective Foster to request that B.F. be interviewed in order to obtain information about Maciel. Detective Foster scheduled an interview at the Child Abuse Listening, Interviewing, and Coordinating Center ("CALICO") in San Leandro, California. *Id.* Mr. Burke drove B.F. to CALICO for the interview on July 12, 2005. On the way to the interview, Mr. Burke told B.F. that he would "beat her ass" if she did not provide the "right" information regarding Maciel at the inteview. *Id.* He also told her not to disclose that he had hit her after she returned home unless she wanted to "start problems." *Id.*

The interview was conducted by Amparo Ozunam, an interview specialist at CALICO; Detective Foster watched the interview on a closed-circuit television in a separate room. *Id.* During the interview,

2

B.F. disclosed information about the time she spent away from home with Maciel. However, she also disclosed that Mr. Burke had inappropriately grabbed her breasts 20-30 times during the past year, touched her buttocks, and repeatedly made inappropriate sexual comments to her. *Id.* at 4. B.F. described the breast grabbing as occurring primarily when Mr. Burke hugged her. As she would withdraw from the hug, he would grab her breast with his hand until she moved it away. *Id.* She stated that it happened "every couple of days," and that the last time he had done this was a "couple of days" prior to her running away on June 21, 2005. B.F. further stated that her stepfather made inappropriate comments to her "all the time," including calling her a "big titty momma" and constantly making reference to her sexual activity. *Id.*

In response to the question of whether she felt safe at home, B.F. stated "I guess." *Id.* However, later in the interview, after talking about Mr. Burke's inappropriate touching, she stated that she thought her stepfather would think she was trying to "start problems" with her mother, and that she expected him to "go off"when she returned from the CALICO interview. *Id.* at 5. B.F. also disclosed that Mr. Burke told B.F. that he would "beat her ass" is she did not provide information regarding Maciel at the interview. *Id.* B.F. further stated that her stepfather had struck her numerous times on July 3, 2005, that he had been arrested for "beating up" her stepsister, and that he had been violent toward her mother. *Id.*

During the interview, Detective Foster noticed that Mr. Burke, who had been waiting outside the interview room, appeared agitated and was growing impatient with the length of the interview. *Id.* He stated that he was concerned because he had to go work and would not be able to take B.F. home if the interview continued. Detective Foster stated that he would not end the interview early, and offered to take B.F. at the end of the interview, to which Mr. Burke acceded. Detective Foster viewed Mr. Burke's impatience and argumentativeness during the interview as suspicious. Mot. at 5.

**B. The "Removal"**

At the conclusion of the interview, Detective Foster determined that B.F. needed to be taken into protective custody for her safety. *Id.* However, he wanted to investigate further before turning her over to Child Protective Services ("CPS"). Detective Foster stated that he believed B.F. was in danger of serious bodily injury had she been returned home. *Id.*

After taking B.F. to the Youth Family Services Bureau ("YFSB") in San Leandro, Detective

3

Foster called Mrs. Burke and told her he had taken B.F. into protective custody, but did not disclose his reason for doing so. *Id.* He also told Mrs. Burke he wanted to speak with her at the YFSB and that she needed to bring insulin for B.F., who is diabetic. Mrs. Burke maintains that Detective Foster threatened to charge her with child endangerment in order to compel her to come to the YFSB; Detective Foster denies making any such threat. *Id.* Once she arrived at YFSB, Mrs. Burke was interviewed by Detective Foster regarding B.F.'s allegations of sexual abuse by Mr. Burke. Mrs. Burke conceded that Mr. Burke and B.F. had given each other "titty twisters," but said B.F. instigated it. Mrs. Burke also stated that both she and Mr. Burke pinched B.F. on the buttocks in order "to get her moving." *Id.* at 6. However, Mrs. Burke denied that Mr. Burke had ever grabbed B.F.'s breasts. At the conclusion of the interview with Mrs. Burke, Detective Foster determined that B.F. could not be returned home. *Id.* Mrs. Burke did not request that B.F. be returned home at the time. *Id.* B.F. was subsequently turned over to CPS.

On July 13, 2005, the day after Detective Foster took B.F. into protective custody, Mrs. Burke attended a CPS meeting regarding B.F.'s detention. *Id.* At this meeting, Mrs. Burke agreed the best course of action would be to leave B.F. in the care of CPS for two weeks while the investigation continued. *Id.* A juvenile court hearing was held on July 15, 2005 (i.e., three days after B.F. was taken into protective custody), and the court issued an order placing B.F. into foster care. B.F. remained in foster care for over a year, until August 2006, at which point she moved in with her mother, but without her stepfather. In June 2007, Mr. Burke moved back into the residence with B.F. and her mother, with whom she currently resides.

**II.    The Arrest**

Believing that Mr. Burke had committed felony child sexual assault, Detective Foster submitted a probable cause declaration to the Alameda County District Attorney's Office. *Id.* at 8. Mr. Burke was ultimately charged on August 11, 2005 with child molestation and sexual battery. *Id.* The same day, after a warrant for Mr. Burke's arrest bad been issued, Detective Foster contacted Deputy Bartholomew, who was working in the sector where Mr. Burke resided, and asked him to serve the arrest warrant on Mr. Burke. *Id.*

Deputy Bartholomew drove to the Burke residence and observed him standing in front of the house with a 60-pound pit bull, at which point Deputy Bartholomew radioed for backup. *Id.* While Mr.

Burke claims that Deputy Bartholomew had his gun drawn during the arrest, Deputy Bartholomew states he "does not recall" whether his gun was drawn. *Id.* Both parties agree there was an exchange between Deputy Bartholomew and Mr. Burke about whether the warrant was valid. *Id.* Deputy Bartholomew stated that he was primarily concerned with the aggressiveness of the bit pull, which he believed to be a threat to him. *Id.* Mr. Burke was moved to his knees, with Deputy Bartholomew's knee in Mr. Burke's back, and was eventually handcuffed. *Id.* at 9. Mr. Burke sustained "minor discomfort," but no injuries, during the arrest. *Id.* During the arrest, Mrs. Burke came out of the house after her husband called her name. *Id.* She states she saw two officers with their guns pointed at Mr. Burke, one standing with a "knee in [her] husband's back." *Id.* Mr. Burke was taken to Santa Rita jail by Deputy Bartholomew.

The criminal case against Mr. Burke was ultimately dismissed because B.F. failed to testify against him. *Id.*

## **LEGAL STANDARD**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). An issue is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the

non-moving party. *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

## **ANALYSIS**

The parties' dueling summary judgment motions each present essentially the same issues; each side argues that the undisputed facts entitle them to summary judgment as a matter of law.

### I. Right to Familial Association

Parents and children have a constitutional right to live together without governmental interference. *Stantosky v. Kramer,* 455 U.S. 745, 753; (1982); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Wallis v. Spencer,* 202 F.3d 1126, 1136 (9th Cir. 2000). This right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency. *Wallis,* 202 F.3d at 1137. Governmental officials are required to obtain prior judicial authorization before intruding on a parent's custody of his or her child unless they possess information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury. *Mabe v. San Bernardino County,* 237 F.3d 110, 1106 (9th Cir. 2001).

Accordingly, the sole issue[1] to be determined to resolve plaintiffs' claim for violation of the right to familial association is whether Detective Foster had a "reasonable belief" that B.F. was in "imminent danger of serious bodily injury":

> Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious

---

[1]Defendants also argue that Detective Foster enjoys qualified immunity under the facts of this case. As the analyses for qualified immunity and whether or not there was a constitutional violation are the same here, i.e., whether Detective Foster had a reasonable belief that B.F. was in imminent danger of serious bodily injury, the resolution of one necessarily resolves the other. Qualified immunity shields a government official from liability for civil damages if (1) the law governing the official's conduct was clearly established; and (2) under that law, the official objectively could have believed that her conduct was lawful. *Mabe*, 237 F.3d at 1106. There is no dispute that the law is well established that a child may be removed from her home without a warrant where the official believes the child is in imminent danger of serious bodily injury (*see* Cal. Welf. & Inst. Code § 305); the sole question with respect to qualified immunity, therefore is whether Detective Foster " objectively could have believed," i.e., had "reasonable cause to believe," that B.F. was in imminent danger of serious bodily injury.

> bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000).

It is undisputed that during the CALICO interview B.F. had relayed to the interviewer that Mr. Burke: 1) had inappropriately grabbed her breasts 20-30 times during the past year, and did so "every couple of days," touched her buttocks, and repeatedly made inappropriate comments such as calling her a "big titty mama"; 2) had struck her numerous times on July 3, 2005, had been arrested for "beating up" her stepsister, and had been violent toward her mother; and 3) told B.F. that he would "beat her ass" if she did not provide the "right" information regarding Maciel at the interview. Additionally, Detective Foster observed Mr. Burke's angry, impatient demeanor during the interview, which he viewed as suspicious. Taken together, these facts are sufficient to establish that Detective Foster had a "reasonable belief" that B.F. was in "imminent danger of serious bodily injury" were she to be returned to the custody of Mr. Burke: Mr. Burke's angry demeanor, coupled with the fact the he had allegedly twice beaten B.F. since she had returned two days ago, were sufficient grounds for Detective Foster to reasonably believe that Mr. Burke would make good on his promise to "beat her ass."

Plaintiffs argue that the fact that at the time B.F. was taken into custody, i.e., at the end of the interview, Detective Foster had not done any investigation to corroborate B.F.'s claims is sufficient to defeat summary judgment because, in the absence of investigation, Detective Foster had no reason to believe any of B.F.'s statements to be true. This argument is unavailing. As an initial matter, the lack of any indicia of the falsity of B.F.'s claims, coupled with Mr. Burke's angry demeanor during the interview, were sufficient to support a reasonable belief that B.F. would be harmed if she was returned to her stepfather.

Moreover, within two hours of taking B.F. into protective custody, Detective Foster interviewed Mrs. Burke, who confirmed that Mr. Burke had struck B.F., and that he had given her "titty twisters." Thus, B.F.'s claims were corroborated by independent evidence virtually immediately after she was taken intro custody, and therefore the scope of any intrusion was *de minimus*. *See Wallis*, 202 F.3d at 1138 (scope of the intrusion must be "reasonably necessary to avert that specific injury"). "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable

inference of imminent danger sufficient to justify taking children into temporary custody"'if they might again be beaten or molested during the time it would take to get a warrant." *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294-1295 (9th Cir. 2007) (citations omitted).

Finally, a juvenile court hearing was held three days after B.F. was taken into protective custody, at which the court issued an order placing B.F. into foster care. The court order was the proximate cause of B.F.'s placement into foster care, and any liability of defendants is therefore limited to the damages, if any, arising out of B.F.'s placement into the care of CPS for 3 days, from July 12 to July 15. *See Hoffman v. Halden*, 268 F.2d 280, 296, 297 (9th Cir.1959), *overruled on other grounds by Cohen v. Norris*, 300 F.2d 24, 29-30 (9th Cir.1962) (responsibility of prosecuting officials terminates when the arrest is made pursuant to court order; the order itself becomes the proximate cause of the plaintiff's injury). However, as noted above, the Court has determined that no constitutional violation took place, and therefore the plaintiffs suffered no damages. Accordingly, summary judgment on the plaintiffs' claim for violation of rights to familial association is granted in the defendants' favor.

## II.     False Arrest

The tort of false imprisonment concerns the violation of someone's liberty of movement without the authority of legal process. In California the elements of false imprisonment are: 1) the nonconsensual, intentional confinement of a person, 2) without lawful privilege, and 3) for an appreciable period of time, however brief. *Blaxland v. Commonwealth Director of Public Prosecutions*, 323 F.3d 1198, 1205 (9th Cir. 2003)**.**

Plaintiffs originally argued that the arrest of Mr. Burke was without a warrant and therefore unlawful. *See* Am. Compl., ¶¶ 82, 97. However, after the arrest warrant was produced by defendants, plaintiffs now appear to argue that the warrant either has been fabricated or is invalid on its face. Pl.'s Opp'n at 4-6. As for the former charge, plaintiffs present absolutely no evidence that the warrant is anything but totally authentic. As for the second charge, plaintiffs' sole argument that the warrant was "facially invalid" is that the judge apparently mistakenly wrote "10-11-05" as the date, rather than the correct date of August 11, 2005 (i.e, "8-11-05"). This apparent typographical error is insufficient to raise a triable issue of fact as to the validity of the warrant.

Additionally, Mrs. Burke claims she was "falsely imprisoned" by Detective Foster when he

1 threatened her with child endangerment in order to compel her to come to the YFSB. However, even
2 assuming this "threat" was actually made, it was made only with intent that Mrs. Burke be made to bring
3 B.F.'s insulin to the YFSB. *See* Def's Mot. at 25. Plaintiffs have made absolutely no showing that
4 Detective Foster intended to confine or deprive Mrs. Burke of freedom of movement, and, in any case,
5 the undisputed facts demonstrate that Mrs. Burke agreed to be interviewed at the YFSB after she brought
6 the insulin for B.F. *See* Wheeler Decl., Ex. C at 81:1-4.

Under these facts, no claim for false arrest may lie, and summary judgment on the Burke's respective claims on these grounds is granted in defendants' favor.

### III. Excessive Force

Plaintiffs argue that Mr. Burke's Fourth Amendment right against unreasonable searches and seizures was violated by Deputy Bartholomew when he pointed his gun at Mr. Burke's head during his arrest.[2] However, under the undisputed facts of this arrest qualified immunity applies to Deputy Bartholomew's conduct.

Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard. Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat of coercion to effect it. *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989). The ultimate "reasonableness" inquiry in an excessive force case is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to their underlying intent or motivation." *Id.* at 397. In determining whether qualified immunity shields an officer from an excessive force claim, the court must determine "whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Kennedy v. City of Ridgefield*, 439 F.3d 1055,1065 (9th Cir. 2006).

Contrary to plaintiffs' claims, it is simply not the case that it is clearly established law that pointing a gun at an unarmed *arrestee* during a lawful arrest constitutes excessive force. *Robinson v.*

---

[2]Defendants anemically argue that whether or not Deputy Bartholomew drew his gun during the arrest is "disputed" because Deputy Bartholomew implausibly states that he "does not recall" whether he drew his gun. *See* Wheeler Decl., Ex. A at 36:11-15. Bartholomew, however, does not actually deny that he drew his gun, only that he "does not recall" whether or not he did so. *Id.* Accordingly, for the purposes of this motion, the Court analyzes the excessive force claim under the assumption that it is undisputed that Bartholomew drew his gun during the arrest.

9

*Solano County,* 278 F.3d 1007, 1016 (9th Cir.2002) involved the police responding to a call about a man carrying a shotgun, who had reportedly shot two dogs, and was in the street yelling. *Id.* at 1010-11. When the police arrived, the unarmed plaintiff approached to explain the situation, but the officers refused to listen and instead pointed their guns at his head, handcuffed him, and shoved him into their patrol car. *Id.* The *Robinson* court stated, "[t]he development of the law with respect to arrests and detentions now allows us to recognize as a general principle that pointing a gun to the head of an apparently unarmed *suspect during an investigation can be* a violation of the Fourth Amendment, *especially where the individual poses no particular danger.*" *Id.* at 1015. Thus, in *Robinson* Ninth Circuit held that 1) pointing a gun at the head of a *suspect during an investigation*, 2) who poses *no particular danger*, 3) *can be* a violation of the Fourth Amendment. The Ninth Circuit did not state, as plaintiffs represent, that pointing a gun at the head of an argumentative arrestee during a lawful arrest pursuant to an arrest warrant is a violation of the Fourth Amendment, only that pointing a gun at an unarmed *suspect during an investigation can be*. Id.; *see also Tekle v. United States,* 457 F.3d 1088, 1097 (9th Cir.2006) ("since 1984 ... pointing a gun at a *suspect's* head *can* constitute excessive force" in the Ninth Circuit) (emphasis added).

It is well established that the Fourth Amendment allows police officers to use reasonable force to effectuate an arrest. *Graham*, 490 U.S. at 397. Here, the undisputed facts include Mr. Burke's antagonistic questioning regarding the validity of the arrest warrant, and an aggressive, barking, 60-pound pit bull within 3-6 feet of the arrest. Under such circumstance, Deputy Bartholomew could have believed his safety was at issue, and therefore he is shielded by qualified immunity from an liability for damages that may have a accrued as a result of his drawing his gun during the arrest.[3] *See Mabe*, 237 F.3d at 1106.

---

[3]Defendants' nonsensical contention that, because the parties stipulated to the filing of an amended complaint naming Bartholomew, plaintiffs somehow waived their right to assert the relation back doctrine with respect to the original complaint wherein Bartholomew was named as unknown Doe, is not persuasive. *See Scott v. Garcia*, 370 F.Supp.2d 1056 (S.D. Cal. 2005) (under California law, a defendant sued by a fictitious name and later brought into the case by an amendment substituting his true name is considered a party to the action from its commencement for purposes of the statute of limitations).

## IV. Intentional Infliction of Emotional Distress

Mr. and Mr. Burke each individually claim intentional infliction of emotion distresss; he as a result of his arrest, she as a result of being "forced" to come to the YFSB. Under California law, the elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Simo v. Union of Needletrades, Indus. & Textile Employees, Southwest Dist. Council*, 322 F.3d 602, 621-622 (9th Cir. 2003)

The plaintiffs have not presented any colorable evidence of severe emotional distress. Mr. Burke's single-sentence statement in his deposition that he suffered from "[sleeplessness], anxiety, depression, all of the above pretty much," without any supporting documentary or medical evidence of any sort, is insufficient to raise a triable issue of fact as to whether Mr. Burke suffered "severe or extreme emotional distress." *See* Powell Decl., Exh. H at 165. The plaintiffs have identified no evidence at all the Mrs. Burke suffered severe emotional distress. Accordingly, summary judgment is granted in defendants' favor on this claim.

## V. *Monell* Claim

Plaintiffs claim that the County of Alameda is liable for allegedly maintaining a policy, practice or procedure resulting from inadequate training whereby Alameda sheriff deputies do not ever procure protective custody warrants and are trained that a protective custody warrant is never required to remove a child. The Supreme Court's benchmark opinion in *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978), held that if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [then] the government as an entity is responsible under § 1983." *Id.* at 694. The Ninth Circuit has stated four conditions that must be satisfied in order to establish municipal liability for failing to act to preserve constitutional rights: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir 1996) (quoting *Oviatt v. Pearce*,

954 F.2d 1470, 1474 (9th Cir.1992)).

As this Court has determined that no constitutional deprivation took place with respect to the warantless removal of B.F., there is no basis for plaintiffs' *Monell* claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(explaining that if an officer has not violated an individual's constitutional rights, "it is inconceivable that [the city] could be liable"); *see also Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978) (holding that municipalities can only be liable when a constitutional deprivation arises from the "execution of a government's policy or custom"). Accordingly, summary judgment is granted in defendants' favor on this claim.

## VI. California Civil Code Section 52.1

In addition to their constitutional claims pursuant to §1983, Plaintiffs sue under the Banes Act, California Civil Code section 52.1. Civil Code section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998). The essence of a Bane Act claim is that the defendant, by "threats, intimidation or coercion," tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law. *Id.*

With respect to Detective Foster, the only "threats, intimidation, or coercion" identified by the Burkes is his alleged threat to charge Mrs. Burke with child endangerment if she did not bring B.F.'s insulin to YFSB. However, section 52.1(j) specifically states that "[s]peech alone is not sufficient to support an action . . except upon a showing that the speech itself threatens *violence* against a specific person." Cal. Civ. Code § 52.1 (j)(emphasis added). Detective Foster's alleged threat to charge Mrs. Burke with child endangerment does not constitute of threat of violence. Accordingly, summary judgment is granted in defendants' favor with respect to Detective Foster.

However, with respect to Deputy Bartholomew, the doctrine of qualified immunity does not apply to claims under Civil Code section 52.1. *Venegas v. County of Los Angeles*, 153 Cal.App.4th 1230, 1243 (2007)*; see also Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007) ("California denies immunity to police officers who use excessive force in arresting a suspect."). Defendants concede that a triable issue of facts exists on this claim as against Bartholomew. *See* Reply at 10. Thus, summary judgment is denied with respect to this claim.

12

## CONCLUSION

For the forgoing reasons, defendants' motion for summary judgment [filed under seal; *see* Docket No. 80] is GRANTED with respect to all claims except the California Civil Code section 52.1 claim against Deputy Bartholomew. Plaintiffs' motion for summary judgment [Docket No. 86] is DENIED. The Court did not consider the "expert" testimony of Stephen Gudelj; therefore plaintiffs' motion to strike his declaration [Docket No. 98] is DENIED AS MOOT.

As no federal claims remain, this Court declines to exercise supplemental jurisdiction over the sole remaining state law claim, and the remaining claim is therefore DISMISSED without prejudice pursuant to Title 28 U.S.C. section 1367(c)(3).

IT IS SO ORDERED.

Dated: 1/10/08

SAUNDRA BROWN ARMSTRONG
United States District Judge